STATE *ex rel.* THE BOARD OF EDUCATION OF THE COUNTY OF KANAWHA, *a corp.*

*v.*

N. H. DYER, *State Director of Health and Chairman of the State Committee of Barbers and Beauticians, et al., etc.*

(No. 13040)

Submitted February 2, 1971.        Decided March 9, 1971.

*Campbell, Love, Woodroe & Kizer, John O. Kizer,* for relator.

*Jack L. Miller, George S. Sharp,* for respondents.

BROWNING, JUDGE:

This is an original proceeding in mandamus instituted in the name of the State of West Virginia at the relation of the Board of Education of the County of Kanawha, a corporation, relator herein, against N. H. Dyer, State Director of Health and Chairman of the State Committee of Barbers and Beauticians, Leonard W. Watson, Joy Lynch, Evaun Hardman, and Dennis Howard, members of the State Committee of Barbers and Beauticians, and E. B. Roush, Director of the Division of Barbers and Beauticians.

Sometime prior to November 4, 1969, relator submitted an application to respondents for a license to operate a school of beauty culture in furtherance of its plans to establish such a school at the Carver Career and Technical center, a vocational school operated by relator. On November 4, 1969, at a meeting of the respondent committee, the following motion was offered, seconded and apparently approved:

> That the application for a license to teach beauty culture in the Carver Career and Technical Center . . . be approved and that a license to operate this school be granted when an inspection of said school reveals that the applicant has complied with the law and rules and regulations governing the operation of beauty schools in this state, and in effect, on the date of inspection.

On December 22, 1969, respondent Roush sent a letter to Clarence E. Burdette, Director of Adult Vocational Education for relator, informing him of the action taken. The letter bore

a notation that respondent Dyer had "approved and forwarded" the letter, and it was signed by him as chairman of the Committee.

Relator alleges that in reliance upon this, it "expended large sums of money furnishing and equipping" the school totalling approximately $33,000.00, entered into one-year contracts with two teachers, and enrolled forty students for the school term commenced in September, 1970. Thereafter, the Committee met on July 21, 1970, and upon hearing representatives of the West Virginia Beauty Schools Association, which represents private beauty schools, and without notice to relator, "arbitrarily, capriciously and unlawfully rescinded its action of November 4, 1969, and voted to reject the application . . . ." Respondent Roush so informed relator of this by letter dated July 29, 1970. This letter was not approved by respondent Dyer, as relator maintains was required by Code, 16-14-3, as amended.

On September 15, 1970, relator notified respondents that it intended to open the school on September 26th pursuant to the authorization given it in the aforementioned December 22, 1969, letter, and paid the required $25.00 inspection fee. On September 16, 1970, respondent Roush, in a letter "approved and forwarded" by respondent Dyer, informed relator that he had received the notice, and that:

\* \* \*

This information has been handed to our inspector, who will call and inspect your school within a few days. If the school is found to meet the specified requirements, a School Opening Certificate will be issued at the earliest possible date.

[Code, 16-14-12, as amended] provides that the State Committee of Barbers and Beauticians be notified, in writing, at least ten days prior to the proposed opening date.

If an inspector does not call within ten days from the date of your notice, September 16, 1970, you may open your school provisionally, subject to later inspection.

If your school does not meet the requirements at the time of inspection, you will not be permitted to continue to operate until it has been arranged in a manner to comply with the law.

\* \* \*

Relator additionally alleges that on November 18, 1970, the Committee met, and the members were advised by respondent Dyer that an inspection of relator's school indicated that there was full compliance with all requirements and that a license should be issued. To this date no such license has been issued.

Respondents herein have filed two separate answers, one purporting to be the answer of *all* the respondents and the other being the answer only of Dyer, Hardman and Roush. In that separate answer, these three respondents also request that their names be stricken from the first answer and from a demurrer filed purportedly on behalf of all the respondents.

In the first answer, respondents maintain that relator applied for the license on July 8, 1969, but that the application was defective in that it did not contain all necessary information. In particular, it did not contain "evidence that the Kanawha Couny Board of Education was professionally competent and financially responsible." Respondents also allege that the persons designated by relator to be instructors were not properly registered with the Committee, nor were they qualified. In addition, respondents state that on January 27, 1970, respondent Dyer sent relator a letter, the partial text of which is as follows:

\* \* \*

The purpose of this letter is to advise you that the [Committee], on December 29, 1969, rescinded its previous motion adopting the new regulations pertaining to the renewal of instructors certificates, July 28, 1969, to become effective September 7, 1969.

As you will observe from the enclosed copy of the regulations, there was no change except the effective date, which was extended from September 7, 1969, to January 1, 1971, in order to give all applicants sufficient time to comply with these regulations.

It is noted that the opening of your school will be during the month of September, 1970. Therefore, with your permission, we are retaining your money order . . . in the amount of $25.00.

Your application is being returned to you in the event you might desire to make any changes, or corrections, particularly with regard to your instructors, in order to bring it up to date.

\* \* \*

On July 21, 1970, respondent Dyer informed the Committee at a meeting that he had returned relator's application, and that relator had returned it July 1, 1970, with no changes. Respondents maintain that because of this failure to fully comply, they unanimously rejected the application on August 17, 1970, and filed a written decision on the matter. Respondents further maintain that the aforementioned letter of September 16, 1970, from Roush to relator was not authorized by the Committee and is, consequently, null and void. Furthermore, respondents say that the inspection of the school alluded to by relator with respect to the November 18, 1970, meeting was not made by a Committee member or a qualified inspector appointed pursuant to Code, 16-14-3, as amended.

In the separate answer filed by respondents Dyer, Hardman and Roush it is admitted, as relator alleges, that the Committee, on July 21, 1970, met without notice to relator and unlawfully rescinded the prior conditional approval. This answer alleges that respondents Watson and Lynch, and a former member, John H. Caudill, voted to rescind, that respondent Hardman was not present at that meeting, and that respondent Dyer did not approve the action taken at that meeting as Code, 16-14-3, as amended, commands he must. In addition, these respondents say that respondent Roush and another, Edwin DeBarr, were directed by Dyer to inspect the school and did, indeed, make such an inspection. Futhermore, it is admitted that relator has fully complied with all requirements and that the license should be issued.

In addition to all the aforementioned pleadings and papers, respondents Watson, Lynch and Howard filed a reply to the separate answer of respondents Dyer, Hardman and Roush,

in which it is asserted that the latter three respondents "have no right to admit any allegations insofar as it pertains to the State Committee, since they are a minority . . . and cannot act individually for and on behalf of such Committee." They also deny once again that the rescission of July 21, 1970, was unlawful, that Dyer did not approve the action, and that such approval by Dyer was even necessary. It is further denied that Roush and DeBarr had the right to inspect the school since they were not official representatives of the Committee.

On December 14, 1970, this Court granted the rule in mandamus returnable on January 13, 1971, and on February 3, 1971, the case was submitted for decision upon all the aforementioned pleadings and exhibits, briefs and oral argument of counsel.

The parties hereinafter will be referred to as the Board and the three members constituting the majority of the Committee of Barbers and Beauticians as the Committee, unless it is necessary to further particularize with regard to one or more of the parties.

The respondents contend that the writ should be refused for the following reasons: (1) the relator has not shown a clear legal right to the relief sought; (2) there is no duty upon the Committee to issue a license to the Board upon the facts of the case; (3) the Board has another adequate remedy at law by virtue of Chapters 29A and 30 of the Code of West Virginia of 1931, as amended; (4) the Board is guilty of laches; and (5) the State Director of Health, as ex officio Chairman of the Committee, exceeded the powers vested in him by the provisions of Article 14 of Chapter 16 of the Code, as amended.

Chapter 16 of the Code is entitled "Public Health" and contains 22 Articles and scores of Sections. Article 14 is entitled "Barbering, Beauty Culture and Manicuring" and although three sections of the Article were amended by Acts of the Legislature, 1967, Regular Session, there has been no amendment to that Article pertinent to the issues raised in this proceeding since it was originally enacted by Acts of the

Legislature, Regular Session, 1951. All of the sections here-inafter referred to will be of Article 14 of Chapter 16 of the Code, as amended.

Section 1 provides:

> There is hereby created in the State department of health, and under its jurisdiction, a division of barbers and beauticians. There is also hereby created a State committee of barbers and beauticians, hereinafter called the committee.

> It shall be unlawful for any person to practice or offer to practice barbering, beauty culture or manicuring in this State without first obtaining a certificate of registration for such purpose from the committee.

Section 10 provides:

> No person, firm or corporation, whether public or private, and whether organized for profit or not, shall own or operate a school of barbering or beauty culture in this State without first obtaining a license so to do from the committee. The application for such license shall be made in writing on forms prescribed and furnished by the committee and shall be signed and verified by the applicant. The applicant shall, in addition to such other information as may be reasonably required by the committee, furnish evidence that (a) the applicant is professionally competent and financially responsible, (b) adequate physical facilities will be available for the school, and (c) persons teaching or instructing therein are registered by the committee as duly qualified instructors. If an applicant desires to own or operate more than one school of barbering or beauty culture, a separate application shall be made and a separate license shall be issued for each.

> All applicants for a license to own or operate a school of barbering or beauty culture shall permit an inspection of such proposed school by the committee or its designated representative to determine whether it is properly fitted and equipped for instruction in barbering or beauty culture. The committee shall promulgate reasonable rules and regulations to implement and make effective the powers, duties and

responsibilities vested in such committee in connection with the licensing and regulation of schools of barbering and beauty culture. If the applicant has met all of the standards and qualifications prescribed herein and by the committee and has complied with the rules and regulations pertaining to the issuance of the license applied for, the committee shall issue such license to the applicant. Thereafter, the committee may suspend, revoke or refuse to renew the license of a school whenever it fails to meet the minimum standards and qualifications required for the issuance of an original license.

The license fee for each school of barbering and for each school of beauty culture shall be twenty-five dollars annually, to be paid in such manner as the committee may prescribe, on or before January first of each year. * * *

The committee shall make reasonable rules and regulations prescribing the standards and requirements to be met by applicants for registration as duly qualified instructors in schools of barbering or beauty culture.

* * *

Section 3 provides that the Committee shall consist of a director of health, ex officio, and four other members to be appointed by the governor, by and with the advice and consent of the senate. Of the four members thus appointed, one must be an employing barber, one an employee barber, one an employing beautician and one an employee beautician. Prior to the 1967 amendment, the section provided that one of the four so appointed should be of the negro race but that provision was deleted in the amendment of 1967.

Section 12 provides that it shall be unlawful for any person, firm, etc., to own or operate a school of beauty culture, etc., unless:

Such . . . school of beauty culture . . . shall before opening its place of business to the public, have been approved by the committee as having met all the requirements and qualifications for such places of business as are required by this article and for this purpose. It shall be the duty of the owner or operator of each such . . . school of beauty culture . . . to notify

the committee, in writing, at least ten days before the proposed opening date of such shop or school, whereupon it shall become the duty of the committee, through the inspectors herein provided for, to inspect such shop or school. * * * Any shop or school meeting the prescribed requirements shall be granted a certificate permitting it to do business as such. If, however, after the lapse of ten days after the giving of such notice of opening to the committee, an inspection is not made or such certificate of opening has not been granted or refused, the owner or operator of such shop or school may open provisionally subject to later acquirement of such certificate and to all other provisions, rules and regulations provided for in this article.

\* \* \*

This provision is contained in Section 3 with regard to inspectors:

The director of health shall appoint not to exceed six inspectors, who shall be registered barbers and beauticians of this State, as herein provided, and it shall be their duty to make frequent inspections of all barber and beauty shops, and all schools of barbering and beauty culture in this State, and to report all violations to the director of health.

Section 3 further provides:

The director of health shall be ex officio chairman of the committee, and the enforcement of all rules and regulations promulgated by the committee pertaining to sanitary conditions of barbering and beauty shops and pertaining to the registration and qualifications of barbers, beauticians and manicurists shall be under his supervision and direction; *no order, rule or regulation promulgated by the committee shall be in force and effect until approved by the director of health.* (Emphasis added.)

It will be observed from the above quotations from certain sections of Article 14 that the State Committee of Barbers and Beauticians is unique. It does not have the exact status of other administrative agencies such as the Workmen's Compensation Appeal Board, the Public Service Commission or the Civil Service Commission, for example, in that it is inextricably

affiliated with, even if indirectly, the State Department of Health. The director of health is the ex officio chairman of the Committee, and whoever holds that position is a permanent member of the Committee without appointment of the governor. Furthermore, while Article 14 provides for an inspection of any proposed school of barbering or beauty culture and that no such school shall be licensed "unless in the opinion of the committee it is properly fitted and equipped," as heretofore noted, the Committee is not authorized to appoint any inspectors, that authority being delegated exclusively to the director of health. Whether the provisions of Article 14 did authorize the Committee as a whole to inspect the premises of an applicant for a new school of barbering or beauty culture is not clear, but the record in this case shows that the Committee did not inspect this school but instead relied upon the report of inspection of E. B. Roush who was, at the time, director of the Division of Barbers and Beauticians, and who had formerly served as an inspector. In addition, shortly after the inspection of this school, he was also again given the title of inspector by the director of health. In his inspection, Roush was accompanied by Edwin DeBarr, assistant chief sanitarian of the environmental section of the department of health.

The Committee attempted to rescind its previous approval of the Board's application by a vote of three members of the Committee (two, apparently including the ex officio member, abstaining) for the following reasons:

(a) The Board of Education did not satisfy the Committee that sufficient hours of classroom work would be taught in order to complete the required two thousand (2,000) hour course within a reasonable time.

(b) Rules and regulations of the Committee require that schools hold regular classes in both theory (recitation) and practice (clinical). Schedule submitted by the Board of Education disclosed that the students would not be receiving the required clinical instruction if they received the required classes in theory.

(c) The Board of Education failed, refused and neglected to furnish the required financial data as required by the Committee's rules and regulations.

(d) The Board of Education failed to furnish the Committee with the names of qualified instructors even though the Board of Education was advised of this deficiency and failed to correct the same.

It will be noted that the lack of qualification of Roush as an inspector was not given as a reason for the rescission. At the time of the conditional approval of the application none of the reasons given for rescission was raised. Furthermore, it will be noted that Roush was an experienced inspector and at the time he made the inspection at the direction of Dr. Dyer, the director of health, he was head of the division under whom the inspectors and other employees were serving. It is also to be observed the attempted rescission was more than ninety days after the conditional granting of the license. Section 8.03 of the Committee's regulations provides:

\* \* \*

The Committee shall approve or deny every application for license within 90 days from the applicant's filing of all required information.

\* \* \*

The Committee did not for approximately eight months question the information contained in the Board's application. The letter to the Board notifying it of the rescission was dated July 29, 1970, although as heretofore noted the conditional license was granted on November 4, 1969.

The meeting with the members of the West Virginia Beauty Schools Association by the Committee on July 21, 1970, and the subsequent notice of August 17, 1970, to the Board that it had "unanimously rejected" their application was invalid inasmuch as the Board was not notified of such meeting and was thereby denied due process of law in view of the order of November 4, 1969, granting the Board the license. It is true that the Board thereafter was granted a hearing, but it is the view of this Court that such did not remedy the deficiency of the meeting at which the action of rescission was taken.

Depositions were taken in this case on January 29, 1971, and Dr. Dyer, the director of health and ex officio chairman of the Committee was asked if he approved the action of the Committee in rescinding the license granted on November 4, 1969, and replied, "I did not." He was also asked under date of August 17, 1970, and as a result of the meeting of July 21, 1970, if he saw a writing denominated "Decision and Reasons" relating to the Board's application and he stated that he did. He was asked these questions and made these answers:

\* \* \*

Q. At the time this was presented to the Committee on August 17, 1970, had it already been signed by Committee members Lynch, Caudill and Watson?

A. Yes; that was my observation.

Q. Did you sign it?

A. I did not.

Q. Did you approve of it?

A. I did not.

Q. Had it been discussed with you prior to the time it was presented to you on August 17?

A. It was not.

He was asked this further question:

Q. Does it represent your views in any way?

A. I think I so-advised the Committee concerning a number of the matters at that particular time, it does not. I was not given an opportunity to discuss or read it even before it was presented; and I cannot consider it as receiving my approval.

Dr. Dyer was asked this further question:

Q. Does the curriculum offered by the Board of Education meet the requirements of the State Committee?

and over objection of counsel, he replied:

A. I have reviewed the curriculum that is being offered at the Carver Career and Technical Center,

and to the best of my knowledge, it meets all the requirements.

In his deposition taken on the same day, Clarence E. Burdette, Director of Adult and Vocational Education of the Kanawha County Board of Education, testified that the two instructors whose names were placed on the original application were substituted by two other women, the first two having declined to serve, and he testified that the latter two were qualified under the new rules and regulations of the Committee although there is a conflict in the evidence upon that question. (Dr. Dyer was asked if he ever advised Burdette that his instructors were not properly qualified to which Dyer answered in the negative. He was then asked if, in his opinion, they were qualified at the time he wrote to Burdette on January 27, 1970, to which he answered in the affirmative. He was also asked if the letter was "intended to inform Mr. Burdette that his instructors were not qualified," to which he answered, "It was not.") Mr. Burdette further testified that the annual budget of the Board of Education of Kanawha County is "approximately $35,000,000." He was asked these two questions and answered as follows: "Q. Has an item been budgeted for the operation of this school? A. Yes, sir; it has. Q. What sum has been budgeted for the operation of this school? A. This is approximately $23,000." He was asked further if that was an adequate sum to operate the school for a period of one year and answered in the affirmative. Burdette was also asked these questions and gave these answers:

Q. Was a floor plan showing the location of the equipment filed with the State Committee?

A. Yes, sir.

Q. Were photographs submitted showing the facility?

A. Yes.

Q. * * * How many hours of instruction has the Board . . . agreed to give per day in the School of Cosmetology?

A. We originally planned a three hour block of time for the students. However, since the Committee

at one time objected to this, we did write a letter to, I believe Dr. Dyer—I have a copy of that letter, in which we indicated our willingness to go to a longer school day, if this was the only factor, or a significant factor holding up the approval of the issuance of our license.

Q. Mr. Burdette, was there any question ever raised at any of your meetings with the Committee about the granting of high school diplomas to students at the Carver Career and Technical Center prior to their completion of their beauty course?

\* \* \*

A. Yes; there were questions raised.

Q. What action did the Board . . . take with respect to that suggestion?

A. \* \* \* I wrote a letter to Dr. Dyer stating that it would be acceptable for us not to award a diploma until a student had completed the entire program, the two thousand hours.

It is apparent from the evidence that the Board did all of this without conceding that it was required to pursuant to the alleged changes in the rules by the Committee.

It is true as contended by counsel for the Committee that the Board had the authority under the provisions of Code, 30-1-9, as amended, for a review of the decision of the Committee by the circuit court and thereafter by this Court. That brings us to the question of whether mandamus will lie inasmuch as the Board had another remedy. The cases are of course voluminous upon this subject and the older ones indicate that mandamus will lie only "in the absence of another remedy at law." There can be no doubt that the rule long ago laid down in those cases has been modified. In *Doran v. Whyte,* 75 W.Va. 368, 83 S.E. 1025 (1914), the Court held that a "remedy given by statute which is as speedy and equally as efficacious as mandamus excludes the latter remedy." In *State ex rel. Simon v. Heatherly,* 96 W.Va. 685, 123 S.E. 795 (1924), it was held that the "true test is whether there is another remedy equally convenient, beneficial and effective. If so, mandamus will not lie. Here there is a remedy

provided by a so-called appeal; but while it may be effective, yet it is not as convenient or beneficial." This is the second syllabus point of *Stowers v. Blackburn*, 141 W.Va. 328, 90 S.E. 2d 277 (1955):

> Mandamus will not be denied because there is another remedy, unless such other remedy is equally beneficial, convenient and effective.

It is the view of this Court that the circumstances of this case bring it peculiarly within the rule that an appeal to the circuit court and thereafter perhaps an appeal to this Court would not be "equally beneficial, convenient and effective" inasmuch as this school has been completed and is in operation, although in violation of the law if the order of rescission of the Committee was valid. Therefore, we are of the view that mandamus is a proper remedy upon the facts of this case.

Upon the question of whether the action of the Committee was arbitrary and capricious such as to warrant the granting of the writ of mandamus to require the issuance of license to the Board, the minutes of the meeting of September 14, 1970, are revealing. One of the members of the Committee, the owner of a beauty parlor, whose vote was necessary to constitute a majority stated: "I can't understand why you can expect anyone to give approval on something that is going to cut their throat. Eventually, this is what that would do to me." Dr. Dyer asked her how she knew it would and she stated: "If I stand and watch someone electrocuted, and if I sit down and become electrocuted, I know this would be dangerous to me." She further stated: "I just couldn't get up and look at myself in the mirror, voting for this." Dr. Dyer stated "We shouldn't allow our bitterness to overcome our judgment." The member that we have heretofore quoted replied, ". . . I am being practical. My practicability is my business." This Court is of the opinion that the reasons advanced by the Committee for the rescission of its previous approval of relator's application should be read in the light of these remarks. We feel they bear heavily on the issue of whether or not the action was arbitrary and capricious. We hold that on the facts of this case the recission of the prior

approval and the Committee's refusal to now approve relator's application and issue a license was and is arbitrary and capricious. Even if it is assumed that licensing is a discretionary function of the respondent Committee, that fact will not bar the awarding of a writ of mandamus where there is evidence of arbitrariness and capriciousness in the exercise of that discretion. See *State ex rel. Bronaugh v. Parkersburg*, 148 W.Va. 568, 136 S.E.2d 783 (1964); *State ex rel. Ellis v. Kelly*, 145 W.Va. 70, 112 S.E.2d 641 (1960); *Dillon v. Bare*, 60 W.Va. 483, 56 S.E. 390 (1906).

Finally, it is the view of this Court that the Board was not guilty of laches. It is true that they did not answer Dr. Dyer's letter informing them that the license had been rescinded for approximately six months, and when they did, they simply returned the application unchanged. However, the Board thereafter requested a hearing which was granted by the Committee and held on September 14, 1970, at which time the Committee refused to issue a permanent license. On November 18, 1970, an inspection of the school at the instance of Dr. Dyer showed that it complied with the necessary requisites for a license and despite the recommendation of Dr. Dyer the Committee again refused and since that time has refused to take any action with regard to issuance of a license. This proceeding in mandamus was instituted in this Court on December 8, 1970, approximately three weeks after the November 18 meeting of the Committee. This is the third syllabus point of *Carter v. Carter*, 107 W.Va. 394, 148 S.E. 378 (1929):

> Delay alone does not constitute laches; it is delay which places another at a disadvantage.

There is no showing in this case that the Board has slept on its rights or that the Committee has in any way been placed at a disadvantage. Furthermore, it is the view of this Court that under the holding of the cases hereinafter cited that in view of those facts even if time began to run against the Board on August 17, 1970, the date of the Committee's written decision attempting to reject the Board's application that the delay was not unreasonable and that the Board is not

therefore barred by laches. See *Stuart v. Lake Washington Realty Corp.*, 141 W.Va. 627, 92 S.E.2d 891 (1956); *Rhodes v. Board of Education*, 95 W.Va. 57, 120 S.E. 183 (1923); *Depue v. Miller*, 65 W.Va. 120, 64 S.E. 740 (1909).

It is the decision of this Court that the Board has shown a clear legal right to the relief sought and that a writ of mandamus will issue against the respondents directing them to issue a license to the Board for the operation of a school of beauty culture and cosmetology at its Carver Career and Technical Center at Malden, Kanawha County.

In conclusion, it is the view of this Court that if the operators and owners of private schools of cosmetology and beauty culture are adversely affected by the aforementioned 1967 amendment permitting boards of education to establish vocational schools, their relief lies in the legislature and not in this Court.

*Writ awarded.*